IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GUALBERTO RODRIGUEZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Judge Ronald A. Guzmán |
| v. ) | |
| ) | 05 C 4857 |
| DUNBAR ARMORED, INC., ) | |
| a foreign corporation, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Gualberto Rodriguez has sued his former employer, Dunbar Armored, Inc. ("Dunbar"), for violations of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, and for retaliatory discharge under the Illinois Workers' Compensation Act ("IWCA"), 820 Ill. Comp. Stat. 305/4(h). Dunbar moves for summary judgment pursuant to Fed. R. Civ. P. ("Rule") 56 and moves to strike portions of Rodriguez's response to Dunbar's statement of facts as well as Rodriguez's affidavit. For the reasons set forth below, the Court denies the motion for summary judgment and denies the motion to strike as moot.[1]

### Facts

Dunbar is an armored car service operating in Chicago. (Def.'s LR 56.1(a)(3) ¶ 1.) In February 2002, Dunbar employed Rodriguez as a Driver/Guard. (*Id.* ¶ 2.) A Driver/Guard operates armored trucks and vans, transports currency and other valuables, loads and unloads the

---

[1]The Court denies Dunbar's motion to strike as moot because in ruling on every motion for summary judgment, the Court, without prompting, conducts its own examination of the parties' LR 56.1 submissions to determine whether they comply with Rule 56(e) and the local rule. To the extent that portions of either party's submissions do not comply with these rules, the Court has disregarded them.

armored vehicles, issues weapons and AVS cards at the "Window," and performs other duties as required. (*Id.* ¶ 3.) Dunbar claims that Driver/Guards also work as building guards when required. (*Id.*) Rodriguez contends that Dunbar only requires Driver/Guards to work entire shifts as building guards if they lack the qualifications to perform regular Driver/Guard responsibilities. (Pl.'s LR 56.1(b)(3)(C) ¶ 16.)

Dunbar regularly conducts evaluations of Driver/Guards by performing random route audits and if an audit reveals that a Driver/Guard has violated a security policy, then, depending upon the nature of the violation, Dunbar may issue the employee a verbal or written warning, or immediately terminate the employee. (*Id.* ¶ 21.) It is Dunbar's policy to terminate Driver/Guards who receive three security violations within a twelve-month period. (*Id.* ¶ 22.)

On August 27, 2002, Rodriguez was written up for a security violation for failing to position his truck in front of a customer location. (*Id.* ¶ 23.) On January 31, 2003, Rodriguez was written up for failing to follow the dispatcher's instructions and causing Dunbar to miss two client pick-ups. (*Id.*) On September 16, 2003, Rodriguez was written up for a security violation for failing to follow the proper dual verification procedures. (*Id.*) These write-ups are not contested by the parties.

On July 31, 2004, Rodriguez injured his right shoulder when opening the door of an armored truck. (*Id.* ¶ 24.) Three days later, Rodriguez reported his injury to Steven Swiatek, Regional Vice President of Operations for the Midwest Region, who was responsible for the profits and losses at the Chicago branch (*id.* ¶ 13) and Richard Binder, the Chicago branch manager, who was responsible for completing workers' compensation injury reports, disciplining Driver/Guards, and occasionally performing route audits (*id.* ¶ 14). (*Id.*) Following his injury, Dunbar granted Rodriguez FMLA medical leave. (*Id.* ¶ 27.) In August 2004,

Rodriguez filed an Application for Adjustment of Claim with the Illinois Industrial Commission. (*Id.* ¶ 28.)

On August 19, 2004, the Illinois Industrial Commission sent a notice of hearing regarding Rodriguez's workers' compensation claim to Dunbar. (Pl.'s Ex. 13, Notice of Hearing.) The notice stated that a hearing would be held on November 5, 2004. (*Id.*; Pl.'s LR56.1(b)(3)(C) ¶ 14.)

On October 12, 2004, Rodriguez's doctor released him to return to work with no restrictions. (*Id.* ¶ 29.) Upon Rodriguez's return from medical leave, Dunbar assigned him to drive routes, work as a building guard, and work the Window. (*Id.* ¶ 30.) Neither Rodriguez's hourly rate of pay nor his Driver/Guard title changed after he filed his workers' compensation claim and returned from FMLA leave. (*Id.* ¶ 64.) When Rodriguez returned to work, he worked as a building guard five times in November 2004, eighteen times in December 2004 and seventeen times in January 2005. (Pl.'s LR 56.1(b)(3)(C) ¶ 18.) After he returned, Jose De Avila, a crew chief, who knew that Rodriguez and Dunbar's management had been "bumping heads over this injury," told Rodriguez that the company was "not too happy" with him and that he should "[j]ust be careful." (Pl.'s Ex. 3, De Avila Dep. at 55.)

On November 17, 2004, Rodriguez received a security warning for failing to follow proper dual verification procedures while driving the armored car. (Def.'s LR 56.1(a)(3) ¶ 41.) This was the first of three security violations Rodriguez received within a twelve-month period.

In January 2005, Rodriguez complained to Larry Hamilton, Regional Human Resources Manager, who is responsible for handling employee complaints (*id.* ¶ 12), about his change in hours and schedule. (Pl.'s LR56.1(b)(3)(C) ¶ 22.) Rodriguez told Hamilton that he felt he was being retaliated against. (*Id.*)

Later, on January 24, 2005, Rodriguez again complained to Hamilton that Dunbar had assigned him too many shifts as a building guard, failed to assign him to the route he considered his own, and gave him less hours than before his leave of absence. (*Id.* ¶ 23; Def.'s LR 56.1(a)(3) ¶ 32.) Rodriguez also told Hamilton that he felt his hours had been cut in retaliation for taking leave and filing a workers' compensation claim. (Pl.'s LR 56.1(b)(3)(C) ¶ 23.) Hamilton contacted Swiatek and Michael DiMaggio, Director of Employee Relations, who is responsible for employee issues including employee discipline at the Chicago branch (Def.'s LR 56.1(a)(3) ¶ 11) and told them about plaintiff's complaints. (*Id.* ¶¶ 34-35.) Swiatek told Binder that Rodriguez had complained to Hamilton about being assigned to building guard duties. (Pl.'s LR 56.1(b)(3)(C) ¶ 23.)

Hamilton also emailed a memorandum to Lynne Cassell, then the Senior Regional Human Resources Manager, and stated that Rodriguez "has not performed the normal duties of a Driver Guard. He has not been assigned to a route, but rather has been assigned to work at the Chicago Branch.". (Def.'s LR 56.1(a)(3) ¶ 36.) Although Swiatek told Hamilton that Rodriguez was not receiving as many Driver/Guard assignments because he was not efficient on routes, Swiatek failed to substantiate this assertion. (Pl.'s LR 56.1(b)(3)(C) ¶ 24; Def.'s LR 56.1(a)(3) ¶¶ 34, 38.) Swiatek ultimately decided to resolve Rodriguez's complaint by assigning him to more routes. (Def.'s LR 56.1(a)(3) ¶ 38.)

On February 2, 2005, Binder performed a route audit of Rodriguez's truck and issued three disciplinary write-ups. (*Id.* ¶ 42.) Rodriguez received two write-ups, both of which were security violations. (*Id.* ¶ 43.) Rodriguez's first write-up was for failing to wear his AVS card, and the second was for completing his partner's manifest, both of which are against Dunbar

4

policy. (*Id.* ¶ 42.)  Binder also disciplined Rodriguez's partner, Sonia Chavez, for allowing Rodriguez to complete her manifest. (*Id.*)

DiMaggio counseled Binder to characterize Rodriguez's AVS card violation as a performance write-up rather than a security violation. (*Id.* ¶ 44.) DiMaggio felt that two security violation write-ups in one day would be "overkill" and was "coming so soon after [plaintiff] had complained about his work situation." (Pl.'s LR 56.1(b)(3)(C) ¶ 27.) Therefore, Rodriguez received a second security violation within a twelve-month period and was advised that the next security violation could result in his termination. (Def.'s LR 56.1(a)(3) ¶ 44.)

On February 5, 2005, Binder, while shopping with his wife on a Saturday, performed another route audit of Rodriguez. (*Id.* ¶ 45.) During the audit, Binder observed Plaintiff carrying a bag in each hand, which violated Dunbar's policy requiring guards to keep their gun hand free. (*Id.* ¶ 46.) As a result, Binder issued to Rodriguez his third security violation within a twelve-month period. (*Id.*)

On February 7, 2005, Dunbar terminated Rodriguez for receiving three security violations within a twelve-month period. (*Id.* ¶ 48.) Binder and Swiatek recommended Rodriguez's termination, and DiMaggio approved it. (*Id.*)

## Discussion

Rule 56(c) allows the court to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In considering the evidence submitted by the parties, the court does not weigh it or determine the truth of asserted matters. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 249 (1986). The court "must view the facts, and all reasonable inferences drawn therefrom, in a light most favorable to the nonmoving party." *Baron v. City of Highland Park*, 195 F.3d 333, 337 (7th Cir. 1999). If a reasonable jury could not find for the party opposing the motion, it must be granted. *Seshadri v. Kasraian*, 130 F.3d 798, 804 (7th Cir. 1997).

## I. FMLA Interference Claim

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided, including the right to reinstatement upon return from leave." 29 U.S.C. § 2614(a), 2615(a)(1). The FMLA states, in relevant part, that an eligible employee is entitled "to be restored to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment." *Id.* § 2614(a)(1)(B).

When claiming an interference with a substantive right under the FMLA, a plaintiff need only prove that the employer denied the employee his entitlements under the Act and does not need to prove discriminatory or retaliatory intent. *Kauffman v. Fed'l Express Corp.*, 426 F.3d 880, 885 (7th Cir. 2005). The proper inquiry is thus limited to whether defendant restored plaintiff to the same or equivalent position. *Id.* An equivalent position must be virtually identical with respect to pay, benefits and working conditions, and substantially similar in terms of duties, responsibilities, skill, effort, responsibility and authority. 29 C.F.R. § 825.215(a); *Mitchell v. Dutchmen Mfg.*, 389 F.3d 746, 748 (7th Cir. 2004). However, the equivalency requirement does not extend to de minimus or intangible aspects of the job. 29 C.F.R. § 825.215(f).

It is undisputed that Rodriguez retained his Driver/Guard title and salary after he returned from FMLA medical leave. (Def.'s LR 56.1(a)(3) ¶ 64.) Therefore, the question is whether he

actually continued to enjoy the benefits, working conditions, duties, and responsibilities that are associated with the position of Driver/Guard.

Upon his return from medical leave, Dunbar began to assign Rodriguez shifts as a building guard, rather than shifts driving a route, with increasing frequency. (Pl.'s LR 56.1(b)(3)(C) ¶ 18.) When Rodriguez returned to work, he worked as a building guard five times in November 2004, eighteen times in December 2004 and seventeen times in January 2005. (*Id.*) The parties dispute whether a Driver/Guard's responsibilities include fulfilling building guard duties. (*Id.* ¶ 16; Def.'s LR 56.1(a)(3) ¶ 3.)

Rodriguez has provided adequate evidence from which a reasonable jury could infer that working full shifts as a building guard is not a working condition, duty, or responsibility of a Driver/Guard. To begin, De Avila, a crew chief, testified that he only knew of one Driver/Guard who worked full shifts as a building guard, and that person was "lacking some credentials," and performed building guard duties "in the meantime." (Pl.'s LR 56.1(b)(3)(C) ¶ 16.) De Avila testified that Driver/Guards who were present in the building and finished with their other duties might on occasion perform some building guard duties before going home. (*Id.*) In contrast, Rodriguez worked shifts as a building guard that encompassed his entire workday. (*Id.* ¶ 18.)

Further, when Rodriguez complained about his frequent building guard assignments, Swiatek explained that Rodriguez was not being assigned as many Driver/Guard shifts because he was inefficient on routes. (Pl.'s LR 56.1(b)(3)(C) ¶ 24; Def.'s LR 56.1(a)(3) ¶¶ 34, 38.) Whether Dunbar was justified in assigning Rodriguez to more building guard shifts than other drivers does not effect the Court's analysis of whether Dunbar interfered with Rodriguez' FMLA rights. Thus, the fact that the record is devoid of any evidence, *i.e.*, documentation, citation or discipline, of Rodriguez being inefficient on routes is of no import as to this claim, but the Court

7

will revisit the issue in the context of his retaliation claim (*Id.*) It is significant, however, that Rodriguez's superiors felt they had to justify why he was not being assigned routes, which in itself tends to support that he was being treated differently than other persons in the Driver/Guard position. (*See* Def.'s Ex. J, Hamilton Dep. Ex. 2, Email from L. Hamilton to L. Cassell of 1/24/05.) Clearly, if he was not being treated differently, there would be no need to explain *why* he was being treated differently. Further, a reasonable jury could infer from Larry Hamilton's email to Lynne Cassell that he acknowledged that Rodriguez, upon returning, "has not performed the normal duties of a Driver Guard. He has not been assigned to a route, but rather has been assigned to work at the Chicago Branch." (*Id.*) Hamilton's email does not clearly state, and Dunbar fails to provide his affidavit to clarify, that he was merely relaying information supplied by Rodriguez. That Hamilton also states "Mr. Rodriguez believes he should be assigned to a route and this is the basis of his complaint" does not necessarily mean that the sentences preceding this sentence are also the basis of Rodriguez' claim. That is merely one interpretation and the jury could reasonably infer that when Hamilton wanted to separate his opinion from that of Rodriguez, he did so explicitly.

In an effort to establish that Driver/Guards fulfill building guard duties, Dunbar has presented the names of some who have worked as building guards. (Def.'s LR 56.1(a)(3) ¶¶ 59-60.) However, without any information regarding the frequency and nature of their building guard assignments, this information does not negate the reasonable inference that Rodriguez's schedule was abnormal for a Driver/Guard.

In sum, based on the record before the Court, a reasonable jury could infer that it was atypical for a Driver/Guard to be assigned to entire building guard shifts and Hamilton recognized that Rodriguez had not been performing the normal duties of a Driver/Guard upon

8

returning from FMLA leave. Accordingly, Rodriguez has created a genuine issue as to a material fact regarding whether Dunbar restored him to virtually identical working conditions with substantially similar duties, responsibilities, skill, effort, responsibility, authority as well as overtime pay as he enjoyed prior to his FMLA leave. Therefore, the Court denies Dunbar's motion for summary judgment as to this claim.

## II. FMLA and IWCA Retaliation

In order to prove retaliation under the FMLA or the IWCA, a plaintiff may proceed under the direct method of proof or the *McDonnell Douglas* burden-shifting method. *See King v. Preferred Tech. Group*, 166 F.3d 887, 892 (7th Cir. 1999) (FMLA); *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004) (FMLA); *Jackson v. Bunge Corp.*, 40 F.3d 239, 242 (7th Cir. 1994) (IWCA). Under either method of proving retaliation, the plaintiff must establish a genuine issue as to a material fact regarding whether the employer acted because of the forbidden animus. *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005).

Under the direct method, there are two kinds of evidence allowed. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). "First, there is direct evidence . . . that, if believed by the trier of fact, would prove the fact in question without reliance on inference or presumption." *Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003).

Rodriguez argues that he has presented direct evidence that Dunbar retaliated against him for taking FMLA leave and for complaining that Dunbar was interfering with his FMLA rights when he returned. He points to Hamilton's email to Lynne Cassell, which states:

> Subsequent to his return to work, Rodriguez has continued to be classified as a Driver Guard, but has not performed the normal duties of a Driver Guard. He has not been assigned to a route, but rather has been assigned to work at the Chicago

9

> Branch. Mr. Rodriguez believes he should be assigned to a route and this is the basis of his complaint.
>
> In a phone conversation with Mike DiMaggio and myself, Steve Swiatek stated that he has no intention of returning Rodriguez to a route because he had low productivity on the route before. Steve assured Mike that he has records to show this, *although my review of his file did not reveal any prior disciplines for low productivity or malingering on the route.* Steve also stated that he has offered another job to Rodriguez as a vault person that he rejected. Rodriguez believe [sic] that he is losing money because he only gets between 30 and 40 hours per week, while newer less tenured employees get 40 to 50 plus hours per week.
>
> Mike told Steve he did not have to offer more than 40 hours per week and that Steve would need to produce records to support his claim of low productivity, which Steve said he could do.
>
> I am not certain that this leaves us in a tenable position if FMLA ran concurrently with the Workers Comp lost time. *I believe we would have a duty to return Rodriguez to his former position if FMLA is an issue, particularly, if there is in fact adverse impact relative to overtime. Under workers compensation there may also be a retaliation issue.* The plan of action is to let Steve make the call.

(Def.'s Ex. J, Hamilton Dep. Ex. 2 (emphasis added.)

Close but no cigar. This email does not constitute direct evidence of a retaliatory motive. It does not admit flat out that anyone at Dunbar acted with retaliatory intent. All of Hamilton's comment are couched in hypothetical terms such that it is not an outright concession.

However, all is not lost for Rodriguez. Under the direct method, he may also present circumstantial evidence that Dunbar acted with a retaliatory motive. Such evidence includes "(1) suspicious timing, ambiguous statements, *etc.*, (2) evidence that similarly situated employees were treated differently, or (3) evidence that the employee was qualified and passed over for the job and the employer's reason for the difference in treatment is a pretext for discrimination." *Gorence v. Eagle Food Ctrs.*, 242 F.3d 759, 762 (7th Cir. 2001). Thus, a plaintiff may establish his case "by assembling a number of pieces of evidence none meaningful in itself, consistent with the proposition of statistical theory that a number of observations each

of which supports a proposition only weakly can, when taken as a whole, provide strong support if all point in the same direction . . . ." *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006). If the plaintiff succeeds in assembling sufficient circumstantial evidence via the direct method, the court need not employ the *McDonnell Douglas* test. *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 666 (7th Cir. 2006).

Hamilton's email, as well as other evidence in the record, constitutes strong circumstantial evidence that Dunbar acted because of a forbidden animus, *i.e.*, that the powers that be at Dunbar created a trumped-up reasons to assign Rodriguez to building guard shifts and to terminate him for his taking FMLA leave and filing a workers' compensation claim. After Hamilton voiced concern regarding whether Dunbar's treatment of Rodriguez was tenable under the requirements of the FMLA and IWCA, Swiatek decided to assign Rodriguez to more routes stating that he did not have time to gather documentation to substantiate the reason for assigning Rodriguez to building guard shifts. (Def.'s LR 56.1(a)(3) ¶ 38; Def.'s Ex. J, Hamilton Dep. at 78.) Further, the record before the Court is devoid of any such documentation to date and the exhibit cited in support of Dunbar's assertion that such documentation exists was omitted from its submissions. Accordingly, it is reasonable to infer that none exists and Swiatek's rationale was a mere pretext for retaliation.

In addition, the timing is suspicious. Shortly after Rodriguez complained to Hamilton about retaliation in general, Hamilton discussed the complaints with DiMaggio and Swiatek, and Hamilton may have discussed Swiatek's decision with Binder. (Pl.'s Ex. 2, DiMaggio Dep. at 52.) On February 2, 2005, nine days after Rodriguez complained to Hamilton about retaliation, Binder audited Rodriguez as a driver on a route and he was written up for two policy violations because he did not display his AVS card on his uniform and he was observed completing his

11

partner's manifest. (Def.'s LR 56.1(a)(3) ¶ 42.) Binder and Swiatek recommended that Rodriguez be terminated immediately because Rodriguez had allegedly committed another policy violation in November 2004 and thus the two purported violations on February 2, 2005 would be his second and third strike. (Pl.'s LR 56.1(b)(3)(C) ¶ 27.) However, DiMaggio felt that it was "overkill" to write up Rodriguez for two security violations in one day. (Pl.'s LR 56.1(b)(3)(C) ¶ 27; Def.'s LR 56.1(a)(3) ¶ 44; Pl.'s Ex. 2, DiMaggio Dep. at 23.) DiMaggio also stated that Rodriguez's complaints to Hamilton likely affected his thinking. (Pl.'s LR 56.1(b)(3)(C) ¶ 27; Pl.'s Ex. 2, DiMaggio Dep. at 23.) Accordingly, DiMaggio changed the AVS card violation to a performance violation, rather than a security violation. (Def.'s LR 56.1(a)(3) ¶ 44.) Due to the suspicious timing and admittedly overzealous enforcement of Dunbar policy by Swiatek and Binder, a reasonable jury could infer from these facts that they had enforced the AVS card policy as a pretext for their retaliatory motive.

On February 5, 2005, a mere three days later, although Binder was not scheduled to work and was shopping downtown with his wife on a Saturday, he decided to conduct an audit of Rodriguez. (Pl.'s LR 56.1(b)(3)(C) ¶ 45.) Binder wrote up Rodriguez for violating Dunbar's gun-hand-free policy, *i.e.*, his third strike, and he and Swiatek again recommended that Rodriguez be terminated. (Def.'s LR 56.1(a)(3) ¶¶ 45-46.) Although Binder also audited another truck that same day and disciplined another driver for a security violation, he audited the other truck after auditing Rodriguez's truck. (*Id.* ¶ 47.) Prior to February 5, 2005, Binder recalls conducting only one other Saturday audit during the three-and-one-half years that he worked for Dunbar. (Def.'s Ex. G, Binder Dep. at 12, 187.)

Furthermore, Dunbar has not provided any record of another employee who has been disciplined for violating the gun-hand-free policy. (Pl.'s LR 56.1(b)(3)(C) ¶ 30.) De Avila, a

crew chief responsible for auditing routes, states that he does not know of any employee, besides Rodriguez, who has been disciplined for violating the gun-hand-free policy. (*Id.*; Pl.'s Ex. 3, De Avila Dep. at 78.) Therefore, due to the suspicious timing and unusual circumstances surrounding the February 5, 2005 audit, especially in light of the aforementioned facts, a jury could reasonably infer that Binder targeted Rodriguez in order to give him his third strike to justify terminating him, selectively enforced the gun-hand-free policy to mask his retaliatory animus and performed the second audit to cover up the fact that he had targeted Rodriguez. It is undisputed that based on this third strike, Binder and Swiatek recommended his termination and that DiMaggio approved it, and thus, it can be reasonably inferred that Binder's motive tainted DiMaggio's decision to terminate him.

Overall, the facts in the record are sufficient to raise an inference of FMLA and IWCA retaliation such that a jury should determine if Dunbar is liable. The Court thus denies Dunbar's motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the Court denies Dunbar's motion for summary judgment [doc. no. 89] and denies as moot Dunbar's motion to strike portions of Rodriguez's Statement in Response to Defendant's Statement of Undisputed Facts and Plaintiff's Affidavit [doc. no. 104].

**SO ORDERED.** ENTERED: 3/30/07

HON. RONALD A. GUZMAN
**United States District Judge**